OPINION OF THE COURT
Alexander Berman, J.
"Justice has been re-routed From present to future tense.
The law is so in love with the law It’s forgotten common sense.”
-Ogden Nash
There exists a latent desire in most people to make "a killing in the market.” The matters before me represent one man’s attempt to do just that, without risk.
The investor uses his own money and deals in "case ac *1043 counts,” the speculator uses partially borrowed money in the form of credit and deals in "margin accounts.” Using the unfortunate experiences of the late 20’s and early 30’s as an example of what occurs when the use of credit goes unsupervised, the Federal Government through the enactment of the Securities and Exchange Act (see US Code, tit 15, § 78a et seq.) and its implementing regulations has seen fit to strictly regulate in minute detail the day-to-day credit aspects of the securities bourse.
The four actions before me were tried separately and consecutively, but have been consolidated for disposition. They involve an attempt by defendant, one Robert Jordan, to not only circumvent the applicable laws and regulations, but to use them as a vehicle for avoiding substantial obligations he knowingly incurred. In essence, he seeks judicial sanction for what might be categorized as cash accounts, which are in reality "do-it-yourself risk-free margin accounts.”
In each of the actions, the details of which are herein discussed at length, plaintiff is a registered securities broker. Defendant, who appears pro se, either purchased securities with money he did not have, or sold stock he did not own. The trades involved were transacted in "cash accounts” rather than "margin accounts”. In each instance, plaintiff seeks to recover the net balance due after they were required to either "buy defendant in” or "sell him out” when he defaulted on the trades.
Were it not for issues of public policy, these would be rather routine matters from a civil litigation standpoint; defendant having entered into contracts which he could not perform, would be required to make good the losses sustained by plaintiffs.
No such simplistic approach is possible, however, despite the fact that after hearing the testimony, I am convinced defendant was acting in bad faith during the periods involved. He obviously possessed a considerable knowledge of brokerage office operations, was astute enough to recognize the inherent weakness, both human and technical, of such operations and unprincipled enough to take advantage of them. It has been clearly established that in each of the trades involved, Jordan knew at the time he placed his orders that he would be unable to perform in the event the market turned against him. It is also clear that he deliberately misled plaintiffs when pressed for reasons why particular transactions could not be executed. *1044 Even the "funds” he was "managing” were nonexistent. All of his actions were calculated to deceive the brokers and further his machinations. As evidenced by these actions, his faith in the frailties of the system and its personnel was not misplaced. What I, as an individual, find distressing is the fact that I am compelled by virtue of my office to afford Robert Jordan some degree of protection.
Indicative of the incongruous situation facing me, is the fact that I must give serious consideration to an argument which I personally find abhorent from a moral standpoint. Defendant, in effect, conceding his bad faith, argues that his conduct was such that any knowledgeable brokerage house would have realized that something was amiss. Using the so-called "know your customer” rule as a foundation, he seeks to avoid liability on a theory which can be stated as follows: "Any broker gullible enough to trust Robert Jordan should not be heard to complain when they lose money as a result of that trust.” Caveat venditor!
Incredibly enough, limited support for such a proposition may be found in the Federal courts (see Naftalin & Co. v Merrill Lynch, Pierce, Fenner & Smith, 469 F2d 1166) and the courts of this State (see oral decision of Mr. Justice Mertins, Thompson McKennon Securities v Konig, Supreme Ct, NY County, Index No. 7339/75). Justice requires, therefore, that I put my personal views aside and consider the merits of defendant’s defense.
Before reaching the facts of the individual actions, the applicable law and regulations and these holdings will be discussed at some length.
Subdivision (b) of section 78cc of the Securities and Exchange Act (US Code, tit 15, § 78a et seq.) provides that contracts made in violation of the act or any rule or regulation thereunder are void. Section 78g (subd [c], par [1]) of the Securities and Exchange Act makes it unlawful for any member of a national exchange or broker to extend or maintain credit for any customer in contravention of the rules and regulations of the Board of Governors of the Federal Reserve System. Such rules and regulations are contained in that body’s Regulation T (34 Fed Reg 9196; 34 Fed Reg 9984; 12 CFR 220.1 et seq.). They represent a comprehensive attempt to control all aspects of credit spectrum. In addition to setting forth the requirements for obvious credit transactions, the so-called margin requirement (12 CFR 220.3), the Board of Gov *1045 ernors recognized the fact that such requirements might be circumvented by use of other types of accounts, and established rules with respect to what are termed "cash transactions” (see 12 CFR 220.4).
Where a customer purchases a security and does not make full cash payment within seven business days, the broker is required to promptly cancel the transaction unless specific regulations permit a different time period (12 CFR 220.4 [c] [2]). 12 CFR 220.4 (c) (6) provides for the granting of extensions by a committee of the exchange under circumstances which warrant it. A number of the transactions before me involve what is known as a "payment versus delivery account,” hereinafter referred to as PVD, a device whereby the purchaser, who becomes the beneficial owner of the stock at the time of purchase, is not required to pay the purchase price until actual delivery of the certificates is made, thus giving the purchaser the use of his money until actual receipt. If a PVD account is utilized, the time requirements for delivery by the broker is up to 35 calendar days after the date of purchase. (12 CFR 220.4 [c] [5].) PVD accounts are normally extended only to large institutional purchasers (defendant here was an individual masquerading as an institution).
The sale of securities is governed by 12 CFR 220.4 (c) (1) (ii). It provides that in the event a customer sells a security, the shares must be promptly deposited in his account. "Promptly” should be interpreted by reference to Securities and Exchange Commission’s regulations, contained in 17 CFR 240.15c3-3 (m). That section provides that if a broker has not received delivery within 10 business days of the trade date, he shall immediately close the transaction by "buying in” the customer. Provision for extensions of the 10-day period are provided for in 17 CFR 240.15c3-3 (n).
One final regulation merits mention: the so-called "90-day rule” (see 12 CFR 220.4 [c] [8]). It provides that no security shall be bought or sold in a cash account if any security purchased by the customer, has for any reason whatever, been sold or delivered out of the account during the preceding 90 days, without having been paid for in full.
It is against this regulatory backdrop that the previously mentioned holdings in Naftalin (469 F2d 1166, supra) and Thompson McKennon (Supreme Ct, NY County, Index No. 7339/75, Mertens, J., supra) must be considered. Because the holding in Naftalin forms the basis for the decision in Me *1046 Kennon and represents a rather outlandish factual situation, it merits detailed analysis.
By all accounts, Neil T. Naftalin was a very persuasive man with strong convictions. Operating through his own brokerage firm, Naftalin & Co. Inc., he managed, during August of 1969 to take a $10,000,000 short position in his cash accounts with 27 of the most widely known securities brokerage firms. His errors of prognostication resulted in an aggregate loss of more than $1,285,000 when the red-faced brokers were required to "buy in” the securities involved, after being informed that Mr. Naftalin had been dealing in phantom issues. Needless to say, the action arose in the context of a bankruptcy proceeding in which the brokers were creditors.
The District Court Judge found the brokers had acted in good faith when they opened the accounts involved. He concluded, however, that they had violated the "prompt deposit” provision of 12 CFR 220.4 (c) (1) (ii) which he interpreted as being limited to seven days by virtue of such a requirement with respect to cash payments on sales contained in 12 CFR 220.4 (c) (2). He set the date for computation of damages as the eighth business day after the sales. It should be noted at the time of the Naftalin transactions the 10-day Securities and Exchange Commission (SEC) regulation (17 CFR 240.15c3-3 (m) had not as yet been promulgated.
The Court of Appeals for the Eighth Circuit agreed that the brokers had acted in good faith on the original trades, but disagreed with the lower court holding as to a seven-day "sell out” requirement. The court determined that each transaction must be viewed individually and a determination made as to when the broker’s conduct was such that they should have been aware of Naftalin’s scheme, or, put another way, when did the broker’s good faith become bad faith?
The matter was remanded "for a fresh determination as to what constituted prompt delivery” and a determination of damages as of that time. (Naftalin & Co. v Merrill Lynch, Pierce, Fenner & Smith, 469 F2d 1166, 1182, supra.)
The court dispelled any doubts with regard to the implications of its holding as far as Naftalin’s conduct was concerned when it stated (supra, p 1181): "It has been forcefully argued that granting relief to knowledgeable and deceitful investors such as Naftalin will merely exacerbate the evil by providing potential wrongdoers with a heads-I-win-tails-you-lose opportu *1047 nity; Le., they can keep the spoils if their illegal schemes prove profitable and foist their losses on broker/dealers if the speculation doesn’t pay off * * * But, if the broker/dealer is aware that he will be saddled with liability for an unlawful extension of credit, he will surely be motivated to act diligently either to preserve his good faith belief in prompt delivery or to liquidate the transaction. Such observation and compliance with the requirements of Regulation T can only have the effect of nipping the extension of illegal credit in the bud; and the broker/dealer, if he acts with genuine good faith, will bear no risk for the occasional devious investor who might slip by with his illegal scheme. There is, moreover, the threat of other penalties to deter investors who might follow Naftalin’s example * * * We have no doubt that under section 7 and Regulation T as presently structured, a broker/dealer who has entered into a special cash account transaction in good faith, but who has not acted diligently to sustain his good faith belief that prompt delivery will be made, cannot excuse his negligence by placing all the blame upon a customer that has deceived him.”
Clearly, then, under the rationale of Naftalin, defendant’s intentions, actions and motives become irrelevant to a determination of his liability.
As previously noted, Naftalin was decided at a time when there was no 10-day delivery requirement. It is my opinion that the Federal Reserve and SEC regulations must be read together and that when 12 CFR 220.4 (c) (1) (ii) speaks of prompt delivery, it should be read as requiring delivery within 10 days set forth in 17 CFR 240.15c3-3 (m).
As to the holding in Thompson McKennon Securities v Konig (Supreme Ct, NY County, Index No. 7339/75, Mertens, J., supra), I respectfully disagree with it insofar as it may be interpreted as authority for voiding, ah initio, a transaction because of a failure on the broker’s part to comply with the provisions of 17 CFR 240.15c3-3 (m). In such an instance, damages, in my opinion, should be computed as of the date plaintiff should have bought in the trade.
In reaching my determinations I have viewed the individual transactions from two separate and distinct points. One, was it valid when entered into and two, if it were, did it, because of the conduct of the brokers, become invalid at some subsequent time, and if so, at what point? In this connection, I would point out that defendant has made no attempt to limit his *1048 damages by alleging a failure on the plaintiff’s part to sell out sooner than they had.
After this rather lengthy preamble, I will now turn to my findings and decisions in the individual actions.
action no. 1

Chicago Corp. v Jordan

On January 20, 1977, Jordan sold 1,500 shares of Rovac Corp. for a total, including commissions, of $27,187.50. He failed to deliver the securities involved. On February 20, 1977, plaintiff based upon reasons given by defendant, applied for and received an extension of time within which to complete the trade because, "Bank has stock in transfer to be split up so that correct denominations can be delivered for its customer.” On February 24, the stock was bought in at a price of $39,625, leaving a net balance due plaintiff of $12,457.50.
I find that plaintiff was acting in good faith when it entered into the transaction. I also find that the application for and the granting of the extension of time was in accordance with the extension provisions of 17 CFR 240.15c3-3 (n). The fact that plaintiff sought an extension after the 10-day period had expired is not, in my opinion, determinative of its bad faith, nor does the fact that plaintiff accepted Jordan’s excuses at their face value establish bad faith on their part.
Accordingly, judgment is granted in favor of the Chicago Corporation in the sum of $12,457.50, together with interest from February 23, 1977, and costs.
action no. 2

Mesirow & Co. v Jordan

On October 26, 1976, Jordan purchased 600 shares of Kimball International class B stock for $7,200. On November 1, he bought 2,000 shares for $24,250; on November 4, 700 shares for $8,312.50 giving him a total holding of 3,300 shares at a cost of $39,762.50. Plaintiff’s monthly statement for the period ending December 31, 1976 (see plaintiff’s Exhibit No. 4) indicates that on November 30, 1976, 600 shares were delivered out; that on December 1, 1976, 700 shares were delivered out and on the 13th of December, the remaining 2,000 were delivered. In each instance, when presented to defendant’s designated agent, United America Bank, insufficient funds *1049 were on hand and the securities returned. It would appear from Exhibit No. 4 that 1,300 shares were received back on the 15th day of December and 2,000 returned on December 20. On the 16th day of December, 2,000 shares were sold out at a price of $19,379.72. On the 17th, 1,300 shares were sold for $13,325. The total amount realized on the sales amounted to $32,704.72, leaving a balance due of $7,057.78.
The trades involved were in a payment versus delivery account, and were therefore subject to a 35-day delivery requirement pursuant to the provisions of 12 CFR 220.4 (c) (5). In calculating when the delivery was required, reference must be made to the trade date and not the settlement date, as argued by counsel for plaintiff. The following represents the relevant dates and amounts:
Date of Date of Amount of
Purchase_No. of Sh. Delivery Due_Delivery_Delivery
1976
October, 26 600 December, 1 November, 30 600
November, 1 2,000 December, 6 December, 1 700
November, 4 700 December, 9 December, 13 2,000
As the above indicates, there was, in fact, a technical failure of delivery as to 1,300 shares for seven days because of the delivery of only 700 shares on December 1, and a failure of delivery of 700 shares for four days when the 2,000 shares were not delivered until December 13. I do not feel, however, particularly in view of the fact defendant has not raised an issue with respect to the price of the stocks for the period in question, that any useful purpose would be served by denying plaintiff the right to enter judgment for the amount claimed to be due.
The fact that defendant was permitted to maintain a payment yersus delivery account is not, in my opinion, sufficient for me to find that the transactions were not entered into in good faith.
Accordingly, Mesirow & Company is granted judgment in the amount of $7,057.78, with interest from December 17, 1976, and costs.
action no. 3

Bacon, Whipple & Co. v Jordan

Jordan’s dealings with this plaintiff are set forth in plaintiff’s Exhibit No. 1. On October 4, 1976, he sold 400 *1050 shares of Energy Conversion Devices at a price of $7,650; on October 6, 1976, he sold another 300 shares at a price of $5,362.50. Delivery of the stock was not made nor was an extension obtained. On February 2, 1977, 700 shares were bought in at a price of $14,700. While in a fail position on the Energy stock, defendant was permitted to continue trading. On December 15, 1976, he sold 200 shares of Rovac Corp. On January 28, 1977, he bought 1,000 shares of Bear Creek Corp. and on January 28, 1977, he bought 500 shares of Makita Electric Works Ltd. on an account ironically designated as a "Trust” account. Defendant defaulted on all of these transactions which were subsequently sold out at a combined loss of $9,776.48.
I find that plaintiff was acting in good faith when it purchased 700 shares of Energy Conversion Devices for Jordan. However, I find it failed to comply with the provisions of 17 CFR 240.15c3-3 (m). Under the rationale of Naftalin (469 F2d 1166, supra), therefore, damages must be limited to the difference between the purchase price and the price of the stock at the time the transactions should have been bought in — i.e., the 11th trading day after October 4 (the 15th) and October 6 (the 18th), 1976.
Here, unlike that present in Mesirow, the delay in buying in the account is substantial (seven days as opposed to four months) and an appreciable swing in price might have occurred. Under the circumstances, a further hearing as to damages will be required to fix plaintiff’s losses. The judgment submitted hereon shall provide for such a hearing, the date of which shall be fixed by me, at Special Term, Part II.
While tempted to do so, I will not find a waiver on the part of defendant in this regard. Plaintiff in order to recover must establish an enforceable contract. He has, under the facts adduced, proved a contract which is only partially enforceable. To find a waiver would be to avoid the public policy behind 17 CFR 240.15c3-3 (m).
The Rovac, Bear Creek and Makita Electric purchases present a somewhat different problem. As noted, those transactions took place at a time when defendant was at least two months in default on the Energy Conversion trades. Under the circumstances, it cannot be said that they were acting in good faith when they continued to permit Jordan to trade. That being so, the contracts were void and unenforceable (see US Code, tit 15, § 789, subd [c], par [1]; § 78cc, subd [b]).
*1051 The one remaining aspect of plaintiffs claim is the purchase of 200 shares of Rovac Corp. on February 2, 1977, at a cost of $3,800. This transaction involves the purchase of shares as a replacement for shares previously forwarded to Jordan in error and not returned after demand. Since this does not form a part of the transactions, I have found to be in violation of the act, entry of judgment is not precluded, and I find plaintiff is entitled to judgment in the amount of $3,800.
In conclusion, I find Bacon, Whipple & Co. is entitled to recover the sum of $3,800 representing the cost of replacing 200 shares of Rovac Corp., and the difference between $7,650 and the cost of 400 shares of Energy Conversion Devices as of October 15, 1976, and $5,362.20 and the cost of 300 shares of Energy Conversion Devices as of October 18, 1976. I find plaintiff is not entitled to recover for the losses sustained with respect to the purchase by Jordan of 200 shares of Rovac Corp. on December 15, 1976, the purchase by Jordan of 1,000 shares of Bear Creek on January 28, 1977 and the purchase by Jordan of 200 shares of Makita Electric Works Ltd.
Accordingly, the claim for damages arising out of the Energy Conversion Devices purchase is severed and an assessment of damages is directed. Judgment is granted in favor of plaintiff in the amount of $3,800, plus interest from February 7, 1977. In all other respects the complaint is dismissed.
Defendant is not, of course, entitled to any recovery against plaintiff in the event the market price of the Energy stock as of October 15 and 18, 1976 exceeded the purchase price. Such a recovery would clearly violate the spirit of the SEC Act and the regulations, and represent an illogical result.
action no. 4

William Blair & Co. v Jordan

Jordan’s trades with Blair & Co. represent his finest hour. He managed to buy and sell the same stock in a single account. Operating through a delivery versus payment account, he, on October 18, 1976, bought 3,500 shares of Limited Stores Inc. at a cost of $67,375. The next day, October 19, he sold 2,200 shares at a price of $39,050. On October 28, he sold an additional 600 shares for $11,775. On October 29, his bank accepted delivery of 1,200 shares and paid plaintiff $23,100. The same day, he sold 800 shares for $15,700. On November 9, he sold 500 more for $10,815.20. On December 2, 2,300 shares *1052 were delivered by Blair in return for $44,275. On various dates between December 7, 1976 and January 21, 1977, Blair bought in 4,100 shares of Limited Stores for $77,500 to cover defendant’s shortage in his account. The balance claimed to be due after these myriad transactions is $20,837.50.
The following chart represents the parties’ transactions and my calculations as to the amount of the claim:
BLAIR JORDAN
Payt
Date Bought Del. Cash Reed Sold Cost
October, 18 3,500 $67,375
October, 19 2,200 $39,050
October, 28 600 11,775
October, 29 1,200 $23,100
October, 29 800 15,700
November, 9 500 10,812.50
December, 2 2,300 44,275
3,500 3,500 67,375 67,375 4,100 77,337.50
Buy-in’s According to Monthly Statement
No. of Sh. Amount
1976
December, 7 500 $10,812.50
December, 10 500 9,812.50
1977
January, 4 1,000 23,000
January, 6 500 11,750
January, 21 1,600 42,800
4,100 sold for 108,175
LESS 4,100 bought for 77,337.50
BALANCE DUE $20,837.50
The above charts indicate two things. The first, that Jordan’s purchase of 3,500 shares was completed. The second, that the funds used for such purpose were, at least indirectly, the funds received from the sales of the very same stock.
Of crucial importance to my determination is the fact that all of the sale transactions after October 19 are in direct violation of the 90-day "freeze” provisions of 12 CFR 220.4 (c) (8) as a result of which they represent illegal extensions of credit by plaintiff to defendant and are therefore unenforceable (see US Code, tit 15, § 78cc, subd [b]).
The sale of 2,200 shares on October 19, 1976, presents a somewhat different problem. It represents the transaction which puts the account within the purview of 12 CFR 220.4 (c) *1053 (8). In my opinion, the mere fact that a person sells a stock one day after he has purchased it does not in and of itself indicate an attempt is being made to circumvent the regulations. I conclude then that Blair & Co. entered into the October 19 transaction in good faith.
However, when defendant failed to deliver the stock within 10 days there was a violation of 17 CFR 240.15c3-3 (m) thereby fixing damages as of the 1st day of November, 1976. There, as in Bacon Whipple, the delay in "buying in” was substantial, thereby negating any claim of waiver.
Accordingly, judgment is granted in favor of defendant dismissing the complaint with respect to the transactions of October 28, 29 and November 9, 1976. Plaintiff is entitled to a judgment for any damages sustained as a result of defendant’s failure to deliver the 2,200 shares sold on October 19, 1976. Such damages are, however, limited to the difference between the sale price, $39,050 and the price of 2,200 shares as of November 1, 1976. A hearing with respect to such valuation will be required before judgment may be entered.
I therefore direct that a hearing on that issue be held at Special Term, Part II, of this court. An order shall be entered hereon providing for the entry of judgment after the conclusion of the hearing which shall be provided for therein.
As mentioned previously, defendant is, of course, not entitled to recover any money in the event the valuation exceeds the amount of the purchase price.
All outstanding motions are denied.